**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alphonso PEDRAZA, Defendant–
Appellant,**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Peter Brent IRELAN, Defendant–
Appellant,**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Enrique PEDRAZA, Defendant–
Appellant.**

Nos. 92–2042, 92–2054 and 92–2084.

United States Court of Appeals,
Tenth Circuit.

June 30, 1994.

Michael G. Katz, Federal Public Defender, James P. Moran, Asst. Federal Public Defender, Denver, CO, for defendant-appellant Alphonso Pedraza.*

Jerry A. Walz, Albuquerque, NM, for defendant-appellant Peter Brent Irelan.

Stephen P. McCue, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellant Enrique Pedraza.

Larry Gomez, Asst. U.S. Atty. (John J. Kelly, U.S. Atty. and James T. Martin, Asst. U.S. Atty., with him on the brief), Albuquerque, NM, for plaintiff-appellee U.S.

Before TACHA and BALDOCK, Circuit Judges, and DAUGHERTY, District Judge.**

BALDOCK, Circuit Judge.***

Defendants Alphonso Pedraza ("Alphonso"), Enrique Pedraza ("Enrique"), and Peter Brent Irelan were convicted by a jury of one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine, 21 U.S.C. § 846; 18 U.S.C. § 2. Enrique was also convicted of one count of possession with intent to distribute more than five kilograms of cocaine, 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. We have jurisdiction under 28 U.S.C. § 1291.

The relevant facts for purposes of this appeal are as follows. Edward Mitchell and George Anthony Seek were longtime drug dealers who had been acquainted since the seventies. While incarcerated together on unrelated drug charges at La Tuna Federal Penitentiary in the early eighties, the two discussed engaging in future drug smuggling operations upon release from prison. On November 25, 1988, Mitchell, who had escaped from a halfway house and was a fugitive from the United States residing in Colombia, South America, placed a telephone

---

* Alphonso Pedraza waived oral argument. His case is therefore submitted on the briefs.

** The Honorable Frederick A. Daugherty, Senior United States District Judge for the Western District of Oklahoma, sitting by designation.

*** Because Defendants raise common issues, these cases have been consolidated for purposes of appeal.

call to Seek, who had been released from La Tuna and was residing in New Mexico. During that call, Mitchell informed Seek that he was arranging a deal to import a large amount of marijuana into the United States. Mitchell asked Seek to assist in arranging for the transportation of the marijuana into the United States in exchange for a large amount of cash, and Seek expressed interest.

At the time of his November 1988 conversation with Mitchell, Seek was working as an informant for the United States Customs Service, in exchange for the government's recommendation that he receive probation for pleading guilty to a 1986 unrelated drug charge. For his assistance in the case against Defendants, the government compensated Seek in the amount of $100,000.

Following the November 25, 1988 conversation between Mitchell and Seek, the two spoke several times and discussed the logistics of smuggling marijuana into New Mexico via aircraft. At some point, Seek introduced the idea of importing cocaine instead of marijuana and informed Mitchell that he knew some people in the United States who were interested in purchasing cocaine. Nearly one year after this conversation, Mitchell became involved with individuals in the cocaine business, and he notified Seek that plans were being formulated to smuggle 500 kilograms of cocaine into Florida by aircraft. In order to facilitate the cocaine-smuggling plan, Mitchell provided Seek with Alphonso's telephone number in Miami, and informed Seek that Alphonso would contact him regarding expense money for the operation. Mitchell also informed Seek that Alphonso's brother Enrique, who was a fugitive from the United States living in Colombia, was involved in the cocaine-smuggling plan.

On November 17, 1989, Alphonso telephoned Seek and informed him that he was going to ship $20,000 in expense money from Florida to Seek in New Mexico. The money was to finance a plan that called for Seek to fly into Colombia and pick up the cocaine and transport it to Miami where it would be delivered to Alphonso. Seek retrieved the $20,000 at the Albuquerque airport. Shortly thereafter, Seek advised Alphonso that another $5,000 was needed for the transporta-

tion of the cocaine. On November 20, 1989, Seek met Alphonso at a Miami shopping mall and Alphonso gave Seek the additional $5,000. On November 21, 1989, Seek notified Mitchell that he was departing from Florida by aircraft to Colombia to transport the cocaine. However, because the Customs Service was unable to obtain country clearance for the trip, Seek called Enrique and told him that the aircraft had been seized and that additional funds would be required to obtain another aircraft to transport the cocaine. On December 13, 1989, Enrique advised Seek that Alphonso was attempting to arrange another drug deal to raise money to pay for the transportation of the cocaine.

While alternative smuggling plans were being formulated, Mitchell and Enrique began having difficulty obtaining expense money from the cocaine owners. Around this time, Mitchell informed Seek that he was so unhappy with his living conditions in Colombia that he was tempted to return to the United States and turn himself over to authorities. Mitchell informed Seek that Enrique was also miserable in Colombia and was "about ready to split too." Seek reassured Mitchell that the deal could go forward. On January 20, 1990, Mitchell was arrested by Colombian authorities. On February 6, 1990, Alphonso was arrested by Florida state officials on unrelated drug charges.

Following Alphonso's arrest, Irelan and Nelson Pedraza ("Nelson") entered the picture. Irelan called Seek and reassured him that the deal was still on, and informed Seek that he would arrange to get an additional $30,000 in expense money. In order to assure Seek, Enrique informed him that his brother Nelson and Irelan, Alphonso's brother-in-law, were reliable and that Seek could speak freely with them concerning the pending operation.

In March 1990, the cocaine owners agreed to provide the expense money. Enrique informed Seek that the money could be picked up in California. Seek and a Customs Service official traveled to Los Angeles and retrieved the $30,000 from an unidentified male. On March 13, 1990, Enrique informed Seek that Irelan would send additional ex-

pense money. On March 14, 1990, Irelan sent $5,000 to Seek in New Mexico.

In April 1990, Enrique and Seek conceived a new plan for smuggling the cocaine into the United States. Enrique proposed that Seek land a seaplane off the Colombian coast and pick up the cocaine from Enrique who would come alongside the seaplane in a boat. The cocaine would then be flown to New Mexico. On May 11, 1990, Irelan and Nelson traveled to New Mexico to help unload the cocaine upon its arrival, and Irelan gave an additional $4,900 in expense money to an undercover Customs Service official. On May 17, 1990, Seek departed for the coast of Colombia, however, high seas prevented a safe water landing. As a result, the attempt had to be aborted, as did a second attempt on May 19, 1990.

After these unsuccessful attempts, Seek proposed that Enrique transport the cocaine by small boat into the waters off the coast of Colombia where a ship would pick up the cocaine and transport it to an area where the seaplane could safely land. Enrique readily agreed to the plan and agreed to provide additional expense money. On May 24, 1990, Irelan sent Seek an additional $19,950.

On June 13, 1990, an undercover Customs Service ship, "The Hope," met a small boat off the coast of Colombia. The skipper of The Hope was Joseph Goulet, a Customs Service employee. Enrique and Jamie Martinez were on board the small boat. At trial, Goulet testified that The Hope was approximately fifteen miles off the coast of Colombia in international waters when the cocaine transfer occurred. However, after trial it was discovered that some native fishermen had seen The Hope as close as five miles off Colombia's coast.

In any event, thirty-six bundles of cocaine, amounting to 707 kilograms, were transferred from Enrique's boat to The Hope, and Enrique and Martinez came aboard. The Hope then left to meet Seek's seaplane at an agreed-upon location. On June 15, 1990, The Hope arrived off the coast of Puerto Rico and the cocaine was transferred to the seaplane. Enrique and Martinez boarded the seaplane,

which departed for Florida for refueling, and then landed at an undercover airstrip in New Mexico.

Undercover Customs Service agents met the seaplane in New Mexico. Agent Jim Stokes, Enrique, Martinez, and Seek then drove to an Albuquerque hotel and met Irelan and Nelson, who had arrived in New Mexico to await the delivery of the cocaine. At the hotel, Enrique placed several telephone calls to Colombia to inform his associates that the cocaine had arrived. He then made arrangements to obtain the money to pay Seek for the transportation of the cocaine. Enrique advised Seek that the payment for the transportation would have to be retrieved in California. On June 17, 1990, Nelson and Seek flew to California and Nelson received $400,000 from Jairo Salazar. Nelson later turned the money over to Seek.

On June 22, 1990, the Customs Service arrested Enrique, Irelan, Martinez, and Nelson. Martinez was later turned over to the Immigration and Naturalization Service ("INS") for deportation. On July 4, 1993, Salazar was arrested at Miami International Airport.

Following the arrests, the Customs Service held a press conference where it displayed the cocaine and stacks of money that had been confiscated upon Defendants' arrest. Following the press conference, the Select Committee of the United States House of Representatives conducted an investigation into the June 22, 1990 arrests, and Chairman Charles Rangel and Representative Bill Richardson issued a joint statement. In that statement, Rangel and Richardson criticized the Customs Service for misstating the facts surrounding the investigation. The statement went on to criticize the Service for "publicly laud[ing] the bust in an effort to glamorize its role in the war on drugs." Finally, the statement criticized the Service for failing to inform the public that "government agencies had orchestrated the bust from the beginning."

On July 11, 1990 a federal grand jury returned a two-count indictment against Alphonso, Enrique, and Irelan.[1] Count I

---

1. Nelson, Salazar, and Mitchell were also indict-   ed but did not stand trial. Nelson and Salazar

charged Defendants with conspiracy to possess with intent to distribute more than five kilograms of cocaine. Count II charged Defendants with possession with intent to distribute more than five kilograms of cocaine. Prior to trial, each Defendant filed numerous motions including motions to dismiss based on outrageous government conduct. Irelan also filed a motion for change of venue. The district court conducted an evidentiary hearing on Defendants' various motions on May 16, 1991. At the hearing, the district court denied Irelan's motion for change of venue. The court declined to rule on Defendants' motions to dismiss until after the close of the government's case.

Defendants were tried jointly before a jury beginning on October 15, 1991. In its case-in-chief, the government relied heavily on Seek's testimony as well as on numerous recorded telephone conversations between Seek and Defendants. While working with Customs Service, Seek had been instructed to record all relevant telephone conversations. At trial, it was discovered that nearly 200 telephone calls made by Seek to Colombia lacked corresponding tapes. Seek testified that he had attempted to record all telephone calls he placed to Colombia, but was not always successful.

The government rested its case on November 13, and on that date the court granted judgment of acquittal on Count II as to Irelan and Alphonso. The court determined that the government had produced insufficient evidence that Irelan or Alphonso actually or constructively possessed or aided and abetted the possession of cocaine. The court denied Defendants' motions to dismiss based on outrageous government conduct. The court also denied Defendants' motions for mistrial based on the government's alleged failure to turn over key evidence to the defense.

On November 15, 1991, the jury found all three Defendants guilty of Count I, and found Enrique guilty of Count II. Following their convictions, Defendants filed motions for a new trial based upon the newly-discovered evidence relating to the testimony of the Colombian fishermen that The Hope came within five miles of the Colombian coast during the undercover operation. Defendants also renewed their motions for dismissal based on outrageous government conduct based in part on this new evidence. The court denied the motions and Defendants were subsequently sentenced. Alphonso was sentenced to 360 months imprisonment, Enrique received a sentence of 384 months imprisonment, and Irelan was sentenced to 240 months imprisonment. Defendants appeal their convictions, and Irelan and Enrique also appeal their sentences.

On appeal, all three Defendants raise the issue of outrageous government conduct. In addition, Alphonso claims the evidence was insufficient to support his conviction, Irelan claims the district court erred in denying his motion for a change in venue, and Enrique claims his convictions should be reversed because the guilty pleas of two coconspirators were introduced into evidence without the proper limiting instructions. Irelan and Enrique also raise the following common issues: the district court erred in (1) failing to grant their motions for mistrial based on the government's failure to turn over key evidence, and (2) denying them the opportunity to effectively cross-examine the government's key witness.[2] Finally, as to sentencing, Irelan claims the district court erred in finding that he was more than a minor participant and Enrique claims the court erroneously found that he was an organizer or leader, and erroneously failed to make findings in light of his objections to the presentence report.

entered plea agreements and testified at Defendants' trial. The indictment against Mitchell was dismissed, and on March 7, 1991, Mitchell was sentenced to thirty years imprisonment by the United States District Court for the District of Wisconsin on a separate drug charge.

**2.** Irelan and Enrique also argue that the indictment should be dismissed because the Customs

Service exceeded its authority in investigating and prosecuting the case against Defendants. Because this issue was raised for the first time on appeal, we do not address it. *See United States v. Mendoza–Lopez,* 7 F.3d 1483, 1485 n. 2 (10th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1552, 128 L.Ed.2d 201 (1994).

## I. OUTRAGEOUS GOVERNMENT CONDUCT

Defendants claim the district court erred in failing to dismiss the indictment based on outrageous government conduct. Defendants recited a litany of alleged improper actions on the part of the government during its undercover operation, the totality of which, they claimed, constituted outrageous government conduct. Defendants argued the government created the crime for which they were indicted and coerced them into participating in the criminal activity. The district court denied Defendants' motion to dismiss finding that the government did not engineer and direct the criminal enterprise from beginning to end, and was not "overly involved" in the creation of the crime. Defendants have the burden of proving outrageous government conduct, *see United States v. Clonts*, 966 F.2d 1366, 1369 (10th Cir.1992), and we review this issue de novo, *United States v. Diggs*, 8 F.3d 1520, 1523 (10th Cir.1993).

■ "When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct," *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir.1992), because prosecution in such a case would offend the Due Process Clause of the Fifth Amendment. *Id.* The outrageous conduct defense, however, is an extraordinary defense that will only be applied in the most egregious circumstances. *Id.* at 910.[3] In order to prevail, the defendant must show that the challenged conduct violates notions of "fundamental fairness" and is "shocking to the universal sense of justice." *United States v. Harris*, 997 F.2d 812, 816 (10th Cir.1993) (citations omitted). In determining whether the government's conduct is outrageous, we look to the totality of the circumstances. *Mosley*, 965 F.2d at 910.[4]

To succeed on an outrageous conduct defense, the defendant must show either: (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime. *Mosley*, 965 F.2d at 911. Excessive government involvement occurs if the government "engineer[s] and direct[s] the criminal enterprise from start to finish." *Id.* However, it is not outrageous for the government to infiltrate an ongoing criminal enterprise, or to induce a defendant to repeat, continue, or even expand previous criminal activity. *Id.* In inducing a suspect to repeat or expand his criminal activity, it is permissible for the government to suggest the illegal activity, provide supplies and expertise, and act as both a supplier and buyer of illegal goods. *Id.* at 911–12.

The second theory underlying an outrageous government conduct defense is significant governmental coercion. Only governmental coercion that is particularly egregious rises to the level of outrageous conduct. *Id.* at 912. Examples of government behavior that have been argued by defendants as constituting outrageous conduct include the holding of a defendant on trumped-up charges and excessive bail, where the only way the defendant could make bail was to agree to a drug transaction initiated by the government, *United States v. Bogart*, 783 F.2d 1428, 1430 (9th Cir.1986), very large financial inducements, including offering narcotics at a "shockingly cheap" price, *see Mosley*, 965 F.2d at 912–13, or, in certain situations, distribution of narcotics to a known addict. *See Harris*, 997 F.2d at 816–18 (refusing to hold that government distribution of narcotics to known addict is always coercive, but speculating that government enter-

---

3. To emphasize this point, we note that we have never issued an opinion overturning a criminal conviction on the ground of outrageous government conduct. *Diggs*, 8 F.3d at 1524.

4. We note that the defense of outrageous conduct differs from the defense of entrapment and may be available where the entrapment defense is not, due to the defendant's predisposition to commit the crime for which he was prosecuted. *Id.* at 908–09. In contrast to the entrapment defense, which looks to the defendant's state of mind, the outrageous conduct defense looks to the government's behavior. *Id.* The outrageous conduct defense, however, is not intended to serve as "a device to circumvent the predisposition test in the entrapment defense." *Id.* at 910; *see also United States v. Warren*, 747 F.2d 1339, 1341–42 (10th Cir.1984) (outrageous conduct defense reserved for "only the most intolerable government conduct").

ing rehabilitation center and selling heroin to a recovering addict may offend due process).

Regardless of which theory a defendant proffers to support an outrageous government conduct defense, he must still prove that the government's conduct directly affected him. *Mosley*, 965 F.2d at 914. No matter how outrageous the government's conduct, due process is not offended unless the government's actions "had a role in inducing the defendant to become involved in the crime." *United States v. Gamble*, 737 F.2d 853, 858 (10th Cir.1984); *see also United States v. Warren*, 747 F.2d 1339, 1343 (10th Cir.1984) (no outrageous conduct where government prepared phony accident reports and guilty pleas because no evidence defendant relied on phony documents in submitting falsified medical bills). A defendant may not assert an outrageous conduct claim based on conduct that harms third parties. *Mosley*, 965 F.2d at 914.

### A. *Creation of the Crime*

Defendants first claim the government created the crime for which they were indicted because Seek first suggested to Mitchell that they arrange to smuggle cocaine instead of marijuana into the United States. Defendants also claim that the government's conduct amounted to creation of the crime because the government directed and controlled every aspect of the cocaine-smuggling operation, and the operation could not have taken place without the government's involvement. Irelan further claims that the government created the crime because the contact between Defendants and the government was initiated by the government, not Defendants.

In *Mosley*, 965 F.2d at 913, we held that the government did not engage in outrageous conduct when an agent, who had been approached by the defendant for purposes of purchasing marijuana, offered to sell the defendant cocaine. We held that the agent's behavior did not result in the government "creating" the crime because the defendant initiated the contact with the agent, had a history of trafficking in both marijuana and cocaine, and was given several days to decide whether to voluntarily accept the agent's co-

caine offer. *Id.* Likewise here, Mitchell, not the government, initiated the contact with Seek in an effort to arrange a marijuana-smuggling operation. Moreover, Mitchell, as well as Alphonso and Enrique, had an extensive drug trafficking history prior to his contact with Seek. Finally, Mitchell was given ample time to decide whether to agree to Seek's suggestion. In fact, the record indicates that Mitchell did not formally agree to the plan to smuggle cocaine until months after Seek's initial suggestion. Because the government is free to induce a suspect to repeat, continue, or even expand previous criminal activity, *id.* at 911, we conclude Seek's suggestion to Mitchell that they smuggle cocaine instead of marijuana did not rise to the level of outrageous conduct.

We further conclude that, although the government was heavily involved in the cocaine-smuggling plan, that involvement did not rise to the level of outrageous conduct. "Even substantial participation by a government agent does not necessarily amount to outrageous conduct." *Clonts*, 966 F.2d at 1369. We find this to be especially so here because, although the government provided transportation alternatives, Defendants arranged for and obtained the cocaine and the transportation money from outside sources unknown to the government. *See Harris*, 997 F.2d at 816 (no outrageous conduct where defendant acted as an intermediary between a source, who was unknown to the government, and the government). In fact, during the course of the cocaine-smuggling operation, Defendants came up with over seven hundred kilograms of cocaine and close to $500,000 to fund the transportation of the cocaine. Given these pivotal roles played by Defendants in the smuggling operation, and the fact that Defendants' sources of the cocaine and transportation money were unknown to the government, we cannot say the government "engineered and directed the criminal enterprise form start to finish." *See Mosley*, 965 F.2d at 911.

We also disagree with Defendants' claim that the cocaine-smuggling operation could not have taken place without the government-provided transportation. Defendants have not carried their burden of proving that

they "[lacked] the capacity to commit the crime without the government's assistance." *See United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983), *cert. denied*, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984). Defendants have failed to provide any evidence that alternative modes of transportation of cocaine into the United States, for the amounts of money to which Defendants had access—nearly $80,000 prior to the transportation and ultimately nearly $500,000—were unavailable. Moreover, experience teaches that means of smuggling cocaine into the United States are all too readily available. As in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), where the government provided the defendants with a necessary chemical for the production of methamphetamine, the fact that the government provided an instrumentality that may have been difficult but not impossible for Defendants to obtain without government assistance does not violate due process.

We likewise reject Irelan's claim that the government created the crime because the government initiated the contact with Defendants. First, contrary to Irelan's assertion, there is no authority for the proposition that the government engages in outrageous contact if it initiates contact with the defendant. Indeed, the authority is to the contrary. *See, e.g., Warren*, 747 F.2d 1339 (no outrageous conduct even though postal inspectors first approached defendant); *Gamble*, 737 F.2d 853 (same). Moreover, Irelan's version of the facts simply is not supported by the record. The evidence indicates that Mitchell first contacted Seek about smuggling drugs into the United States, the government had no independent knowledge of Defendants, and the government only gained knowledge of Defendants through Mitchell and Defendants themselves. Enrique and Alphonso voluntarily entered the cocaine-smuggling operation through Mitchell, a coconspirator, and Irelan voluntarily entered the scheme through Enrique. Furthermore, contrary to Irelan's assertions, the evidence indicates that Irelan first telephoned Seek.

### B. *Coercion*

Defendants next claim the government coerced them into participating in the conspiracy. Defendants argue the government used financial inducements as a means of coercion. Enrique also claims the government coerced him to import the cocaine as a means to escape Colombia, and Irelan and Alphonso claim they were coerced because of their familial relationships to Enrique.

We conclude Defendants have failed to show that the government engaged in "particularly egregious," *Mosley*, 965 F.2d at 912, coercive tactics in the form of financial inducements. First, there is no evidence that the government promised Defendants any particular "cut" from the sale of the cocaine in the United States, nor is there any suggestion that the government, as transporter, would have been in a position to make any such offers. Moreover, the only evidence of financial reward actually promised by the government included small amounts of spending money, an occasional meal, and an occasional hotel room. We hold that these do not qualify as "very large financial inducements," *see id.*, sufficient to induce Defendants to participate in a huge cocaine-smuggling venture.

Furthermore, Enrique cannot seriously contend that his only option in leaving Colombia was to join an expansive cocaine-smuggling operation. Unlike the situation described in *Bogart*, 783 F.2d 1428, where it was asserted that the government wrongfully detained a suspect and offered a drug transaction as the suspect's only means of making bail, Enrique was a fugitive from justice, and was present in Colombia by choice. The government was in no way responsible for Enrique's presence in Colombia, and if he became unhappy with his living conditions there he certainly had the option of surrendering to the United States. Instead, he chose to join a cocaine conspiracy—a choice which had nothing to do with any coercion on the part of the government.[5] We likewise reject Irelan and Alphonso's claim that be-

---

5. We also note that to the extent Enrique's options in leaving Colombia were limited, the limitation was a direct result of his fugitive status. Therefore, our acceptance of Enrique's coercion argument would allow him to benefit from his initial decision to flee the United States. This we are not prepared to do.

cause of their familial relationships, Enrique's situation led them to be coerced into joining the conspiracy.

## C. *Other Instances of Outrageous Conduct*

Finally, Defendants list numerous actions by the government that they claim amount to outrageous government conduct. These actions include the government's assistance in smuggling several kilograms of cocaine into the United States, choice of an unseemly character like Seek with whom to do business, payment to Seek of large sums of money, support of Seek's light sentence on prior drug charges, grant of permission to Seek to pilot the seaplane without a license, failure to record or destruction of some 200 telephone conversations between Seek and Defendants, encouragement of Mitchell to go forward with the deal after he indicated he wanted to turn himself in, entrance into Colombian waters without permission, decision to turn Martinez over to the INS instead of prosecuting him, and misrepresentations in a press conference following the Defendants' arrests. The short answer is none of these actions, individually, or taken as a whole, can support an outrageous conduct defense because Defendants have failed to show that any of these government actions played a role in inducing them to join the cocaine-smuggling operation. *See Warren*, 747 F.2d at 1343 (outrageous conduct defense fails unless government's actions "had a role in inducing the defendant to become involved in the crime").[6]

## D. *Summary*

In sum, Defendants have failed to demonstrate that the government's conduct, taken as a whole, amounted to government creation of the cocaine-smuggling crime, or government coercion of Defendants into participating in the criminal activity. Accordingly, we conclude the district court did not err in rejecting Defendants' outrageous government conduct defense.

---

**6.** Defendants' claim as to the unrecorded telephone calls appears two-fold. To the extent Defendants claim the government's failure to record all telephone calls is outrageous conduct, we reject that claim because this inaction could not have induced Defendants to participate in the crime. To the extent Defendants claim these so-called "missing tapes" may contain evidence that would implicate the government and prove their outrageous conduct defense, we can find no evidence to support this conclusory allegation, and reject the claim on that basis.

## II. SUFFICIENCY OF THE EVIDENCE

■ Alphonso claims the evidence was insufficient to support his conspiracy conviction. In reviewing a conviction for sufficiency of the evidence, we evaluate the evidence in the light most favorable to the government. *United States v. Record*, 873 F.2d 1363, 1367 (10th Cir.1989). We examine the direct and circumstantial evidence to determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *United States v. Young*, 954 F.2d 614, 618 (10th Cir.1992).

■ The elements of conspiracy are: "(1) agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators." *United States v. Johnson*, 12 F.3d 1540, 1545 (10th Cir.1993).

■ At trial, evidence was presented that Mitchell identified Alphonso as the contact person in the Miami area for the cocaine-smuggling group. Shortly thereafter, Alphonso delivered $25,000 to Seek for the express purpose of financing the transportation of the cocaine into the United States. The evidence also demonstrated that in December 1989, Alphonso involved himself in other drug deals in order to raise more money to fund the transportation. Taken in a light most favorable to the government, this evidence, together with all reasonable inferences, clearly supports the finding that Alphonso agreed to violate the federal drug laws, knew that the object of the operation was to smuggle cocaine into the United States, and knowingly and voluntarily involved himself in the operation. This evidence, together with the evidence linking Enrique, Irelan, Nelson, Mitchell, and Salazar to the operation also shows an interdependence among the coconspirators. We therefore hold the record contains ample evi-

dence from which the jury could conclude Alphonso was guilty of conspiracy to possess with intent to distribute more than five kilograms of cocaine.

## III. VENUE

■ Irelan claims the district court erred in denying his motion for a change in venue. Prior to trial, Irelan filed a motion for a change in venue claiming pretrial publicity associated with the press conference staged by the government in June 1990 would prevent him from receiving a fair trial. The district court, concluding that a jury free from prejudice could be selected in Albuquerque or Santa Fe, denied Irelan's motion. We review for abuse of discretion. *United States v. Abello–Silva*, 948 F.2d 1168, 1176 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992).

Fed.R.Crim.P. 21(a) dictates that the court shall transfer venue if there exists "so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." Whether a jury harbors prejudice related to pretrial publicity is best determined during voir dire examination. *Abello–Silva*, 948 F.2d at 1177. "In our review of the voir dire, we must determine 'whether the judge had a reasonable basis for concluding the jurors selected could be impartial.'" *Id.* at 1177–78 (quoting *United States v. Hueftle*, 687 F.2d 1305, 1310 (10th Cir.1982)).

While we recognize that the government was eventually criticized for the press conference it held after Defendants' arrests, we conclude this publicity did not entitle Irelan to a change in venue. During voir dire, the district court conducted a thorough inquiry into whether any prospective juror had been exposed to pretrial publicity. Only two panel members recalled hearing about the case from the media, and neither of them was selected to sit on the jury. No juror actually selected for Irelan's trial recalled any pretrial exposure to publicity surrounding the case. Because the district court adequately inquired into the jurors' exposure to pretrial publicity, and because the selected jurors had no such exposure, we conclude the district court did not abuse its discretion in "concluding the jurors selected could be impartial." *See id.*

## IV. COCONSPIRATOR GUILTY PLEAS

Enrique claims his convictions should be reversed because the guilty pleas of two coconspirators were introduced into evidence without the proper limiting instructions. We disagree.

The government called Salazar and Nelson as witnesses in its case-in-chief. Salazar and Nelson had pleaded guilty to Count I of the indictment—*i.e.*, conspiring with Defendants and Mitchell to possess with intent to distribute more than five kilograms of cocaine. During direct examination, the government questioned both witnesses about their guilty pleas. Defendants did not object nor request a limiting instruction. In addition, Nelson's guilty plea was admitted into evidence without objection. During cross-examination, Defense counsel for Enrique further questioned Salazar and Nelson about their guilty pleas and their obligations to testify. The court did not specifically instruct the jury that the guilty pleas could only be used to assess the witnesses' credibility. Because Defendants failed to object or request such a limiting instruction, we review only for plain error. *See United States v. Peterman*, 841 F.2d 1474, 1481 (10th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989); Fed.R.Crim.P. 52(b).

■ It is fundamental that the guilt of a coconspirator may not be used to establish the guilt of a defendant. *United States v. Baez*, 703 F.2d 453, 455 (10th Cir.1983). "If the [coconspirator] testifies, however, either the government or the defense may elicit evidence of a guilty plea for the jury to consider in assessing the [coconspirator's] credibility as a witness." *Id.* Instructions that specifically limit the use of a coconspirator's guilty plea to that of assessing credibility should be given, and the failure to do so may rise to the level of plain error. *Id.; United States v. Austin*, 786 F.2d 986, 991 (10th Cir.1986).

■ In determining whether the failure to give a cautionary instruction results in plain error, we consider the following factors: (1) whether there was a proper purpose in introducing the guilty plea; (2) whether the guilty pleas were improperly emphasized or used as evidence of substantive guilt; (3) whether the alleged error was invited by defense counsel; (4) whether the failure to object could have been the result of tactical considerations; and (5) whether, in light of all of the evidence, the error was harmless beyond a reasonable doubt. *United States v. Paterson,* 780 F.2d 883, 885 (10th Cir.1986) (listing factors to consider in determining whether the admission of a codefendant's guilty plea is plain error).

■ Applying these factors to the facts of this case, we conclude the court's failure to give instructions that specifically limited the use of the coconspirators' guilty plea to that of assessing their credibility did not result in plain error. The government's sole purpose in introducing the coconspirators' guilty pleas was the entirely permissible one of minimizing damage to the witnesses' credibility during their examination. Enrique has directed our attention to no impermissible use, and our review of the record reveals that the government did not improperly emphasize the guilty pleas or attempt to use them as evidence of Enrique's guilt. The government did not refer to the guilty pleas during opening statements, closing arguments, or elsewhere during the trial. *Compare Austin,* 786 F.2d at 991 (plain error where prosecution repeatedly refers to codefendant guilty plea during opening and closing), *with Peterman,* 841 F.2d at 1481 (no plain error where witness's prior conviction mentioned only during examination of witness). Moreover, although we cannot say the alleged error was invited by defense counsel or the result of a tactical consideration, counsel for Enrique was also responsible for eliciting testimony from Salazar and Nelson about their guilty pleas. Finally, given the overwhelming evidence of Enrique's guilt in this case, including numerous taped telephone calls between Enrique and Seek that clearly implicate Enrique in the conspiracy, we conclude the lack of a limiting instruction "did not have a substantial influence on the outcome of the trial nor does it leave [us] in grave doubt as to whether it had such effect." *See United States v. Jefferson,* 925 F.2d 1242, 1255 (10th Cir.1991) (internal quotations omitted) (applying nonconstitutional harmless error standard).

## V. MOTIONS FOR MISTRIAL

Irelan and Enrique next claim the district court erred in failing to grant their motions for mistrial based on the government's failure to turn over key evidence.[7] Irelan's and Enrique's claims are based on (1) the government's alleged failure to produce and preserve certain tape recordings of telephone conversations between Seek and Defendants, and (2) the government's release of Martinez to the INS. We address these claims in turn, reviewing the district court's denial of the motions for mistrial for abuse of discretion. *United States v. Lambert,* 995 F.2d 1006, 1007 (10th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 333, 126 L.Ed.2d 278 (1993).

### A. *"Missing Tapes"*

Although recordings of several hundred conversations relating to the undercover operation were turned over to the defense, Seek's telephone bills reflect that the defense was not given tapes of nearly 200 telephone calls Seek placed to Colombia. Irelan and Enrique claimed, alternatively, (1) the government had possession of the tapes and failed to turn them over, and (2) Seek, who was acting as a government agent, destroyed the tapes in bad faith. The government claimed these "missing tapes" were not turned over to the defense because they never existed. The government claimed the

---

7. In his brief, Irelan relies solely on the government's failure to turn over key evidence as a basis for mistrial. Enrique joins this portion of Irelan's brief, and also attempts to reassert other grounds he raised in his motion for mistrial before the district court. In his brief to us, Enrique merely states, "[f]or the reasons ... stated in district court," a mistrial is warranted. Because Enrique provides no supporting arguments or authority to explain how the district court erred in denying his motion for mistrial on those grounds, we will not address them. *See Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545, 1554 n. 6 (10th Cir.1992).

calls were not recorded due to, *inter alia,* failure of equipment, Seek's inexperience, or Seek's failure to make contact with the party he was calling. Without specifically addressing the issue of whether the "missing tapes" ever existed, and, if they did, what became of them, the district court denied the motion Defendants' motions for mistrial.

■ The prosecution has a duty to disclose material exculpatory evidence to the defendant. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). To establish that evidence is material in the *Brady* sense, the defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *see also United States v. Bonnett,* 877 F.2d 1450, 1460 (10th Cir.1989) (defendant has the burden of proving a *Brady* violation). Failure to provide such evidence violates the defendant's right to due process regardless of the good or bad faith of the prosecution. *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). Conversely, if the government destroys or otherwise fails to preserve potentially exculpatory evidence, the defendant bears the burden of demonstrating that the government acted in bad faith in doing so. *Id.* at 58, 109 S.Ct. at 337–38.

■ We conclude Irelan and Enrique have presented insufficient evidence that the government either failed to turn over "missing tapes," or that it destroyed them in bad faith. The fact of the matter is, Irelan and Enrique have failed to produce any convincing evidence that these tapes ever existed. The only evidence that arguably supports Irelan and Enrique's position is Seek's rather equivocal statement that he "attempted" to record all telephone calls he placed to Colombia. From this statement, Irelan and Enrique would have us infer that Seek was actually successful in recording all calls, and then infer that the reason they are "missing" is because the government is refusing to turn them over to the defense, or has destroyed them in bad faith. Given the state of the record, including Seek's testimony that he

was not always successful in his attempt to record all telephone calls, we are not prepared to take such inferential leaps.

Even assuming the "missing tapes" did exist, and the government had possession of them and failed to turn them over to Defendants, Irelan and Enrique have still failed to establish a *Brady* violation. Irelan and Enrique suggest that the "missing tapes" may contain evidence that would advance their outrageous government conduct defense, but they provide no evidence to support that assertion. Irelan and Enrique have failed to show that the telephone calls that were the subject of the "missing tapes" would have in any way implicated the government in its role in the undercover cocaine-smuggling operation. As a result, Irelan and Enrique have failed to show "there is a reasonable probability that, had the ["missing tapes"] been disclosed to the defense, the result of the proceeding would have been different," *see Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, and their *Brady* claim fails. Likewise, to the extent Irelan and Enrique allege the government destroyed the "missing tapes," their claim fails because they have produced no evidence of bad faith on the part of the government. We conclude the district court did not abuse its discretion in denying Irelan's and Enrique's motions for mistrial based on the alleged "missing tapes."

### B. *Martinez*

The district court also denied Irelan's and Enrique's motions for mistrial based on the government's release of Martinez to the INS. Irelan and Enrique claimed their Sixth Amendment confrontation rights were violated because Martinez could possibly have offered valuable information concerning the ownership of the cocaine—*i.e.,* that Martinez was the true owner of the cocaine, the location of the offshore transfer, and "the particulars among the government agents and all the defendants."

■ To establish a Sixth Amendment violation based on the government's deportation of a potential witness, the defendant must make a "plausible showing that the testimony of the deported witnesses would have been

material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982). Although a defendant need not demonstrate *how* a witness may testify, he must make a showing as to which events the witness might testify, and the relevancy of the events to the crime charged. *Id.* at 871, 102 S.Ct. at 3448. "[S]anctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873–74, 102 S.Ct. at 3450.

■ We conclude Irelan and Enrique have failed to establish that any testimony on the part of Martinez would have been material and favorable to their defense. As to Irelan and Enrique's claim that Martinez could have testified to the ownership of the cocaine and the location of the offshore transfer of the cocaine from Enrique's boat to The Hope, these issues are irrelevant to the crimes charged—*i.e.,* conspiracy and possession with intent to distribute. Neither conspiracy to possess cocaine, nor possession of cocaine with intent to distribute requires a showing that the defendant actually owned the drugs. *See, e.g., supra* part II (listing elements of conspiracy); *United States v. Parrish,* 925 F.2d 1293, 1296 (10th Cir.1991) (possession of narcotics with intent to distribute merely requires showing that defendant knowingly exercised dominion and control over narcotics). Moreover, the location of the offshore transfer of cocaine from Enrique's boat to The Hope is irrelevant because, even assuming the transfer occurred in Colombian waters, Irelan's and Enrique's convictions would still stand. *See, e.g., United States v. Endicott,* 803 F.2d 506, 514 (9th Cir.1986) (United States jurisdiction to enforce laws extends to acts occurring outside its territory if those acts are intended to produce detrimental effects in United States); *United States v. Palella,* 846 F.2d

977, 980 (5th Cir.) (upholding conspiracy and possession with intent to distribute convictions where actual delivery of heroin occurred in Italy), *cert. denied,* 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988); *see also supra* part I.C (holding that location of cocaine transfer is irrelevant to outrageous conduct defense).

Irelan and Enrique also claim that Martinez could have testified to the interaction between Defendants and the government agents, to shed light, presumably, on the government's outrageous conduct. However, although we glean from the record that Martinez was in the presence of Irelan or Enrique at all relevant times, neither have offered any evidence of a single event occurring in Martinez's presence, to which his testimony would have lent support to their outrageous conduct defense. Because Irelan and Enrique have failed to plausibly demonstrate the potential materiality of Martinez's testimony, and have failed to show that there was a reasonable likelihood that Martinez's testimony could have affected the outcome, we hold the district court did not abuse its discretion in denying Irelan's and Enrique's motions for mistrial on this claim.

## VI. CROSS–EXAMINATION OF SEEK

Irelan and Enrique next claim their Sixth Amendment confrontation rights were violated because the district court denied them the opportunity to effectively cross-examine the government's key witness. In an effort to impeach Seek's credibility, Irelan and Enrique sought to question Seek concerning eight outstanding debts, some of which had been reduced to judgments. Enrique also sought to question Seek about a prior conviction that was more than ten years old, and an employment application in which Seek made alleged misrepresentations.[8] The district court sustained the government's objections to these inquiries on the grounds of irrelevancy, and potential for prejudice, confusion,

---

8. In their briefs, Irelan and Enrique also claim that they sought to question Seek about his outstanding debts in order to demonstrate that Seek had a financial motive in ensuring that he "ensnared" Defendants in the undercover operation. Because Irelan and Enrique did not offer this

basis in their proffer to the district court, we do not address it. *See United States v. Mendoza–Lopez,* 7 F.3d 1483, 1484 n. 2 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1552, 128 L.Ed.2d 201 (1994).

and waste of time under Fed.R.Evid. 403. We review de novo whether a defendant's confrontation rights were violated by reason of improper cross-examination restrictions, and whether any such violation was harmless. *Miranda v. Cooper,* 967 F.2d 392, 401 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).

The defendant's right to cross-examine adverse witnesses is an integral part of the right to confrontation. *Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987). This right, however, is not absolute or unlimited. *Miranda,* 967 F.2d at 401. The trial court "retain[s] wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294–95, 88 L.Ed.2d 15 (1985) (per curiam). The Sixth Amendment guarantees an *"opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (emphasis in original). The burden is on the defendant to establish that he was "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness," and "expos[ing] the jury to the facts from which jurors ... could appropriately draw inferences to the reliability of the witness." *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974).

We hold the district court's restriction of Irelan's and Enrique's cross-examinations of Seek did not violate their Sixth Amendment rights to confrontation. The record reflects that Irelan and Enrique exhaustively cross-examined Seek for three days. During cross-examination, Irelan and Enrique questioned Seek about his involvement in Defendants' case including the benefits he received in exchange for his cooperation, his relationship with the Customs Service, his background and past employment, his prior drug dealings and convictions, and

his life-style as a drug dealer. In doing so, Irelan and Enrique were able to elicit testimony concerning Seek's tendency to act in a deceitful manner. Our review of the record indicates that Irelan and Enrique were provided an adequate "opportunity for effective cross-examination," *Fensterer,* 474 U.S. at 20, 106 S.Ct. at 294, of Seek, and through their cross-examination, the jury was exposed to the relevant facts from which it could "appropriately draw inferences to [Seek's] reliability." *See Davis,* 415 U.S. at 318, 94 S.Ct. at 1111.

Moreover, the matters of Seek's outstanding debts and his twenty-year-old conviction were not appropriate areas for cross-examination. Irelan and Enrique sought to question Seek about his outstanding debts to establish his "dishonesty and unreliability." Evidence of a witness's failure to pay his debts, however, is not probative on the issue of truthfulness. *See United States v. Lanza,* 790 F.2d 1015, 1020 (2d Cir.) (testimony of three witnesses to whom witness was indebted not probative on issue of witness's truthfulness), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). Accordingly, the district court's restriction of Irelan's and Enrique's inquiry into this area was entirely proper. *See* Fed.R.Evid. 608(b) (subject to Rule 404, impeachment based on extrinsic evidence of specific instances of conduct is appropriate only if probative of truthfulness or lack of truthfulness). Furthermore, the district court's restriction of Enrique's inquiry into Seek's twenty-year old prior conviction was likewise appropriate. For purpose of impeachment, Fed.R.Evid. 609, except in limited circumstances, specifically limits the introduction of prior convictions to those that are less than ten years old. We therefore conclude Irelan and Enrique were not deprived of their Sixth Amendment rights to confront adverse witnesses.

## VII. SENTENCING

### A. *Minor Participant*

Irelan claims the district court erred in refusing to grant him a two-level downward adjustment based on his role in the offense as a "minor participant." *See*

U.S.S.G. § 3B1.2. We review for clear error. *United States v. Williams,* 923 F.2d 1397, 1404 (10th Cir.1990), *cert. denied,* 500 U.S. 925, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991).

The Sentencing Guidelines define "minor participant" as one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment (n.1). "The defendant has the burden of proof and must show his entitlement to a downward adjustment by a preponderance of the evidence." *United States v. Maldonado–Campos,* 920 F.2d 714, 717 (10th Cir.1990).

We hold the record contains sufficient evidence from which the district court could conclude Irelan was more than a minor participant in the cocaine-smuggling venture. The district court's finding that Irelan was a willing, knowing participant who "did whatever [he] could" to facilitate the offense is amply supported by the record. Moreover, the evidence at trial tended to show that Irelan, an active participant for over four months in arranging and providing money to facilitate the transportation of the cocaine, was as culpable as most of the other participants. Under these circumstances, the district court did not clearly err in finding that Irelan was not entitled to a downward adjustment.

### B. *Organizer, Leader, Manager, or Supervisor*

Enrique claims the district court erred in applying a two-level upward adjustment to his offense level for his role as an organizer, leader, manager, or supervisor of the cocaine-smuggling operation. *See* U.S.S.G. § 3B1.1. We review for clear error. *United States v. Hanif,* 1 F.3d 998, 1004 (10th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993).

■ To qualify as a supervisor, "one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity." *Id.* (quoting *United States v. Backas,* 901 F.2d 1528, 1530 (10th Cir.), *cert. denied,* 498 U.S. 870, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990)). The court may consider, *inter alia,* the defendant's exercise of decisionmaking authority, the nature of his participation in the offense, and the degree of control and authority he exercised over others. *Id.*

■ The evidence at trial established that, for over five months Enrique participated in the direction of the cocaine-smuggling operation. Enrique's involvement included the arrangement for large sums of money to finance the criminal venture. On various occasions, Enrique informed Seek that a certain sum of money was available, and provided Seek directions on how to obtain the money. On each of these occasions, someone other than Enrique actually turned the money over to Seek, leading to the inference that Enrique directed the others to deliver the money. Moreover, the record reflects that Enrique organized and arranged for the cocaine and played an integral part in planning the transportation of the cocaine into the United States. From this evidence, the district court could easily conclude that Enrique "[gave] some form of direction or supervision to someone subordinate in the criminal activity." *Hanif,* 1 F.3d at 1004, and therefore qualified for a two-level upward adjustment for his role as an organizer, leader, manager, or supervisor.

### C. *Fed.R.Crim.P. 32(c)(3)(D)*

■ Enrique's final issue is that the district court failed to comply with Fed. R.Crim.P. 32(c)(3)(D) and make written findings in light of his objections to the presentence report. We agree.

Rule 32(c)(3)(D) provides that if the defendant challenges the factual accuracy of a presentence report, the district court must, "as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." *See also United States v. Roederer,* 11 F.3d 973, 980 (10th Cir.1993). When faced with specific allegations of factual inaccuracy by the defendant, the court cannot satisfy Rule 32(c)(3)(D) by simply stating that it adopts the factual findings and guideline application in the presentence report. *Id.* at 981. If the district court fails to comply with Rule

32(c)(3)(D), we must remand for the court to either make the necessary findings and attach them to the presentence report, or enter a declaration that it did not take the controverted matters into account in sentencing the defendant. *United States v. Jimenez*, 928 F.2d 356, 365 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991).

In the instant case, Enrique alleged numerous factual inaccuracies in the presentence report's version of his offense conduct, and the court failed to attach to the report written findings as to each allegation, or state that it did not take the controverted matters into account in sentencing Enrique. At sentencing, the court merely stated that it "adopts the factual findings and guideline applications in the presentence report except as to the four level role adjustment made in the presentence investigation for organizer-leader." As we stated in *Roederer,* 11 F.3d at 981, this language does not satisfy the court's Rule 32(c)(3)(D) duties. Accordingly, a remand is necessary.

### VIII. SUMMARY

We REMAND Enrique's case to the district court for findings pursuant to Fed. R.Crim.P. 32(c)(3)(D). In all other respects, we AFFIRM.