**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 17, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RANDY JAY DYKE,

      Defendant – Appellant,

_____

FEDERAL PUBLIC DEFENDER FOR
THE OFFICES OF THE NORTHERN
AND EASTERN DISTRICTS OF
OKLAHOMA,

      Amicus Curiae.

_____

No. 12-3057

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DON MILTON STEELE,
a/k/a Donald Milton Steele,

Defendant – Appellant,

_____

FEDERAL PUBLIC DEFENDER FOR
THE OFFICES OF THE NORTHERN
AND EASTERN DISTRICTS OF
OKLAHOMA,

No. 12-3060

Amicus Curiae.

---

**Appeals from the United States District Court
for the District of Kansas
(D.C. Nos. 10-CR-20037-JWL-01 and 10-CR-20037-JWL-02)**

---

Lumen N. Mulligan, Lawrence, Kansas for Defendant-Appellant Randy Jay Dyke.

Jonathan Laurans, Kansas City, Missouri, for Defendant-Appellant Donald Milton Steele.

Tristram W. Hunt, Assistant United States Attorney, Kansas City, Kansas (Barry R. Grissom, United States Attorney, Kansas City, Kansas, with him on the brief in Case No. 12-3057; Barry R. Grissom, United States Attorney, Kansas City, Kansas, James A. Brown, Assistant United States Attorney, Topeka, Kansas, on the brief in Case No. 12-3060) for Plaintiff-Appellee, and Lanny A. Breuer, Assistant Attorney General, John D. Buretta, Deputy Assistant Attorney General, David M. Lieberman, Attorney, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., with them on the supplemental brief for Plaintiff-Appellee.

Julia L. O'Connell, Federal Public Defender, Carl Folsom, III, Research and Writing Specialist, Office of the Federal Public Defender, Northern and Eastern Districts of Oklahoma, Tulsa, Oklahoma, filed an amicus brief in support of Defendants-Appellants Randy Jay Dyke and Donald Milton Steele.

---

Before **HARTZ, ANDERSON,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Randy Dyke and Donald Steele labored in a small time criminal ring on a Kansas farm. They got by forging checks, peddling pills, and selling marijuana. That is, until the government showed up. Undercover agents sought to convince them to expand their

2

operations, enticing them with the promise that the road to riches lay in counterfeiting currency and manufacturing methamphetamine, and assuring them that the agents had the expertise to help make all this happen.

It didn't prove a hard sale. Mr. Dyke said he'd been "dreaming about" getting into the meth business for years and Mr. Steele replied cagily, "we either get three meals and a cot or we can retire." But by the time the sting operation ended, Mr. Steele's less sanguine prediction proved out. Soon he and his partner were arrested and a jury found them guilty of drug, forgery, and counterfeiting charges, rejecting their entrapment defense along the way.

Recognizing the heavy burden facing anyone seeking to overturn a jury's factual findings, Mr. Dyke and Mr. Steele apply most of their efforts on appeal in a different direction. They argue the charges against them should've been dismissed as a matter of law, before the jury ever heard them, because the undercover operation amounted to "outrageous governmental conduct."

The so-called "outrageous governmental conduct defense" is something of a curiosity. In *United States v. Russell*, the Supreme Court held that the entrapment defense is based in statute and "focus[es] on the intent or predisposition of the defendant" rather than on a judgment about the propriety of the conduct of government agents. 411 U.S. 423, 429 (1973). After holding that much the Court then proceeded in *dicta* to imagine that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that," quite apart from any statute, "due process

3

principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 430.

Within just three years, though, *Russell*'s author was busy trying to put back in the bottle the genie he had loosed. Speaking for only a plurality, Justice Rehnquist said that it is a "misapprehen[sion]" to think some robust outrageous governmental conduct defense might some day be found inhering in the due process clause. *Hampton v. United States*, 425 U.S. 484, 489 (1976). The "execution of the federal laws under our Constitution," the Justice reminded us, "is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations." *Id.* at 490. What authority the due process clause does give courts to oversee the execution of the laws "come[s] into play only when the Government activity in question violates some protected right of the [d]*efendant*." *Id.* (emphasis added). The fact that officers may engage in outrageous conduct is not enough: the remedy in those cases lies "not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." *Id.* Judges, the *Hampton* plurality said, simply do not possess a "chancellor's foot veto over law enforcement practices of which [they do] not approve." *Id.* (internal quotation marks omitted).

What a plurality said in *Hampton*, a majority later repeated in *United States v. Payner,* 447 U.S. 727 (1980). There, the Court indicated that "even if we assume [the government's conduct] was so outrageous as to offend fundamental 'canons of decency and fairness,' the fact remains that '[t]he limitations of the Due Process Clause . . . come

4

into play only when the Government activity in question violates some protected right of the *defendant*.'" *Id.* at 737 n.9 (internal citation omitted). The Supreme Court has since reminded us — regularly — that we are not to reverse convictions simply to punish bad behavior by governmental agents, but should do so only when the bad behavior precipitates serious prejudice to some recognized legal right of the particular defendant before us. *See, e.g.*, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-56 (1988); *United States v. Mechanik*, 475 U.S. 66, 72-73 (1986); *United States v. Hasting*, 461 U.S. 499, 506-07 (1983); *United States v. Morrison*, 449 U.S. 361, 365-67 (1981).

In light of all this forthing and backing, one might reasonably ask: what's left of the outrageous government conduct defense?

Critics suggest nothing. An individual defendant has no individualized interest in rooting out offensive governmental conduct, that's an interest all citizens share alike and so one better adapted for a legislature to pursue by statute than a defendant by motion. The plurality's direction in *Hampton*, repeated by the majority in *Payner*, tells us all we need to know. *See, e.g.*, *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995); *United States v. Tucker*, 28 F.3d 1420, 1423-24 (6th Cir. 1994); *United States v. Miller*, 891 F.2d 1265, 1271 (7th Cir. 1989) (Easterbrook, J., concurring). Besides, to the extent the defendant's personal interests might be harmed by outrageous governmental conduct, other defenses already exist to address the problem. If the conduct of the undercover government agents was so domineering that the defendant failed to form the necessary *mens rea* for an offense, he must be acquitted. Even if the necessary *mens rea* is present

5

(and *actus reus* of course), if the government's conduct forced the defendant to engage in a crime or induced him to commit a crime he wasn't predisposed to commit, he will be able to invoke the duress or entrapment defenses.

Critics suggest still other reasons for burying the outrageous governmental conduct defense. They say it amounts to "circumvention" of the key limitation the Supreme Court has placed on the entrapment defense by focusing judicial attention on the government's conduct rather than on the defendant's predisposition, an avenue the Supreme Court explored and rejected when formulating the entrapment defense. *Tucker*, 28 F.3d at 1428. They say the defense, though nominally rooted in due process, smacks of disfavored criminal common law-making by federal courts. They say that the doctrine's remedy — exculpation of a defendant who admittedly committed a crime — sits awkwardly with the Supreme Court's instruction that such exclusionary-rule like remedies should be a last resort rather than an immediate impulse. *See United States v. Van Engel*, 15 F.3d 623, 631-32 (7th Cir. 1993), *abrogated on other grounds by United States v. Canoy*, 38 F.3d 893, 902 (7th Cir. 1994).

Critics worry, too, that the defense isn't susceptible to judicially manageable standards. What is "outrageous" enough to warrant relief, in their view, is a question that can be resolved only by consultation with a judge's "lower intestines." *Miller*, 891 F.2d at 1273. So, for example, Mr. Dyke and Mr. Steele explained at oral argument that they aren't outraged by sting operations directed against public officials. But they also suggested that they *are* offended by similar sting operations directed against "low-level"

6

drug dealers (no doubt having themselves in mind). Others might not be troubled by either of these kinds of operations but might be offended instead by ones that risk injuring innocent bystanders (say, when the government sets up a fencing operation that creates demand for criminals to steal). *Id.* Others still might not be worried by any of these possibilities but might be upset when the government engages in or encourages immorality (say, when the government offers access to sexual favors in order to elicit incriminating information from a target). *Id.* In the end, any limits that might be imposed on governmental conduct, critics suggest, are simply indeterminate and so more rightly the province of legislatures than courts.

Finding criticisms like these persuasive, two circuits have disavowed the defense altogether. *See Tucker*, 28 F.3d at 1426-27, 1428; *Boyd*, 55 F.3d at 241. Another has questioned its only case applying the doctrine to afford a defendant relief. *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998) (noting that the defense there is "hanging by a thread"). Others circuits still, and we find ourselves in this camp, recognized the doctrine's potential viability in the immediate aftermath of *Russell* and have so far declined to inter it formally, even while they have yet to find a single case where the defense applies. One might call this the never say never camp — or at least the don't-say-never-if-you-don't-have-to camp. *See e.g.*, *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993) (declining to bury the defense but calling it "moribund" and refusing to apply it to the case at hand); *United States v. Jones*, 13 F.3d 100, 104 (4th Cir. 1993) (same); *United States v. Jayyousi*, 657 F.3d 1085, 1111-12 (11th Cir. 2011) (same).

7

That isn't to suggest the doctrine lacks its defenders. Some commentators suggest it is a critical safeguard against ever inviting the day when our government finds itself at liberty to enlist everyone to spy on everyone else, a sort of hedge against a bleak totalitarian future. *See, e.g.*, John David Buretta, Note, *Reconfiguring the Entrapment and Outrageous Government Conduct Doctrines*, 84 Geo. L.J. 1945, 1975 (1996); Paul Marcus, *The Due Process Defense in Entrapment Cases: The Journey Back*, 27 Am. Crim. L. Rev. 457, 465 (1990); Stephen A. Miller, Comment, *The Case for Preserving the Outrageous Government Conduct Defense*, 91 Nw. U. L. Rev. 305, 327-28 (1996); *Harris v. United States*, 331 U.S. 145, 173 (1947) (Frankfurter, J., dissenting) ("Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole.").

Neither, on this account, is the entrapment defense up to the task. The entrapment defense has been construed as statutory and so might be legislatively withdrawn anytime. *See Russell*, 411 U.S. at 432-33; Miller, *supra*, at 338. It protects only those who lack criminal predisposition, allowing governmental conduct to go unchecked in cases where criminally minded defendants are involved. *See* Miller, *supra*, at 328-29, 372. Instead of offending the separation of powers, defenders suggest the outrageous government conduct defense protects it. Courts have an interest in preventing their processes from being used to legitimize and perpetuate offensive executive conduct, in assuring public confidence in the administration of law. On this view, individuals pursuing the defense in court are not so much usurpers of legislative authority as guardians of the judicial

8

process.  *See e.g.*, *Rochin v. California*, 342 U.S. 165, 169-70 (1952) (Frankfurter, J.); *United States v. Archer*, 486 F.2d 670, 676-77 (2d Cir. 1973) (Friendly, J.).

While it's admittedly a hard thing to find a federal circuit case using the doctrine to strike down a conviction, defenders suggest this is only because our society (happily) hasn't degenerated to the point where it often needs to be invoked.  The significance of this due process guarantee lies not in how often it is successfully asserted but in the assurance it gives us all that the law imposes meaningful boundaries on the power of government.  While critics may be right that the boundary lines can be difficult to discern, defenders reply that the job of policing them is no less important for it.  *See* Miller, *supra*, at 339-40.

For our part, we avoid taking sides in this debate today.  This isn't to say we are entirely convinced that our prior cases, cases discussing the doctrine but never using it to grant relief, necessarily bind us to accept the doctrine's viability after *Hampton* and *Payner*.  Some claim, with some degree of plausibility, that discussions of the defense in cases like these are no more than "speculative" (Appellee Supp. Br. at 3.), or "dicta" (*Tucker*, 28 F.3d at 1424-25), or both (*Jayyousi*, 657 F.3d at 1111), given that relief is never granted.  Neither in declining to take up sides do we mean to suggest we are more or less persuaded by the critics or defenders of the doctrine.  Rather, we decline to take sides only because in this case — as in so many cases before it — the right answers to the hard questions about the doctrine just don't matter.  Even spotting (without granting) the defendants before us their claimed defense's *bona fides*, we can offer them the assurance

9

that their convictions are legally sound and they are entitled to no relief. However vital the doctrine may or may not be, we are confident the government has not crossed any boundary line here.

As articulated by this circuit, a defendant asserting the outrageous governmental conduct defense bears the burden of proving either "(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994). Admittedly, it's unclear what analytically additive work the second of these two options plays, separate from the duress or entrapment defenses. But the defendants in this case stop short of alleging coercion and, in any event, we consider the question of entrapment shortly, so we may lay that complication aside.

The remaining question, what constitutes "excessive governmental involvement in the creation of the crime," is, of course, hardly a self-defining inquiry. But our cases suggest at least a few guiding principles and they prove more than enough to allow us to resolve this case with confidence.

In the first place, we naturally examine the government's conduct. We have said, however, that cause to worry exists only when the government "engineer[s] and direct[s] the criminal enterprise from start to finish." *Id.* at 1521 (alterations in original). By contrast, we have indicated that the government is free "to infiltrate an ongoing criminal enterprise," and "to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *United States v. Mosley*, 965 F.2d

906, 911 (10th Cir. 1992). As part of its effort to induce a suspect to "repeat, continue, or expand criminal activity," moreover, we have said "the government can suggest the illegal activity," "can provide supplies and expertise for the illegal activity," and "can act as both supplier and buyer in sales of illegal goods." *Id.* at 911-12. Now, admittedly, trying to discern where inducing the expansion of an ongoing criminal enterprise ends and engineering and directing a criminal enterprise from start to finish begins may be a tricky business. But it is the business our cases suggest, and we can at least be sure of this: the fact the government induces a defendant who is already engaged in a criminal enterprise to commit a new "crime" subject to some additional criminal sanction is not by itself enough to warrant relief. Neither is it enough that the government offers supplies and expertise necessary to facilitate the new crime.

Our cases also take into consideration the past and current criminal activities of the defendant. Because the inquiry, we have said, turns in part "on the connection between the crime prosecuted and the defendant's *prior conduct*," *id.* at 913 (emphasis added), more aggressive law enforcement techniques are permissible against those who already have a history of engaging in related crimes than those without. *Compare Pedraza*, 27 F.3d at 1522 (although "government was heavily involved in the cocaine-smuggling plan," defendants "had an extensive drug trafficking history"), *with United States v. Sandia*, 188 F.3d 1215, 1219-20 (10th Cir. 1999) (no evidence of prior criminal history). Neither have we examined only the defendant's *prior* conduct before the government's intervention. Our cases have often looked as well to how eagerly and

11

actively the defendant himself participated in the *current* crime charged, often if not always finding this an important and decisive factor. Indeed, in some ways this inquiry seems a necessary corollary, perhaps even the flip side, of our inquiry into whether the government engineered and directed the charged crime from start to finish. *See Mosley*, 965 F.2d at 913 (emphasizing that the defendant "had several days to decide voluntarily whether to" participate in the crime); *Pedraza*, 27 F.3d at 1522 (emphasizing degree of defendant's involvement in the crime in question); *United States v. Diaz*, 189 F.3d 1239, 1245-46 (10th Cir. 1999) (refusing to find outrageous governmental conduct because of defendant's predisposition to commit the charged crime).

One may wonder whether examining the defendant's past and current conduct reintroduces the question of predisposition, and in this way leads the outrageous conduct defense to overlap (again) at least in part with entrapment. But our existing cases suggest that looking to the defendant's predisposition, his past and current conduct, as well as the government's behavior, is appropriate because what qualifies as outrageous governmental conduct depends on an appreciation of the "totality of the circumstances" and is reserved "for only the most egregious circumstances," triggered only when the circumstances are, when viewed in whole, "shocking, outrageous, and clearly intolerable." *Mosley*, 965 F.2d at 910. On this view, predisposition is a reasonable consideration because it "speaks to the proportionality of the government's conduct." Buretta, *supra*, at 1982. What's outrageous conduct by the government depends in part on who the government is dealing with: "[e]xtreme government inducement is more troubling when it targets the

nonpredisposed . . . [s]imilarly, if the defendant is already involved in criminal activity similar to the type of crime the government is attempting to induce him to commit, then the government's conduct is a less important consideration." *Id.* The partial overlap with the entrapment doctrine might be said to be unremarkable, too, given that the defenses have separate sources — one statutory, the other due process — and it is hardly unknown for due process inquiries both to be context sensitive and to duplicate in part work done by statutes. *See, e.g., Russell*, 411 U.S. at 431-33; *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances."). If, as we have said many times, any due process defense in this arena sets the outermost bounds of acceptable executive conduct, it would seem sensible as well that it would take account of *all* facts potentially bearing on a fair assessment of that conduct. Even so, the overlap between the doctrines remains incomplete and some additional work might be done by the outrageous government conduct defense: the defense may take account of predisposition even as it leaves open at least the possibility of relief in the presence of predisposition, something entrapment does not.

With these guiding principles distilled from our existing case law we return to Mr. Dyke and Mr. Steele and quickly find they preclude relief.

To begin, the government's conduct here was pretty prosaic stuff for undercover sting operations. The agents sometimes brought the defendants beer. They offered to exchange items like antifreeze or a fuel pump for contraband. They provided

13

counterfeiting equipment and the initial batch of methamphetamine. They claimed the expertise needed to help the defendants expand their preexisting criminal enterprise. We don't doubt all this had the effect of inducing the defendants to commit new crimes and incur additional criminal exposure. But that, we've seen, is not inherently impermissible. Indeed, this court has regularly approved governmental sting operations involving governmental conduct equally (and considerably more) aggressive than anything that took place in this case. *See, e.g.*, *Pedraza*, 27 F.3d at 1517-19 (government pushed a plan to smuggle 707 kilograms of cocaine); *United States v. Sneed*, 34 F.3d 1570, 1574-78 (10th Cir. 1994) (government set up scheme to manipulate penny stock market, netting $900,000); *United States v. Warren*, 747 F.2d 1339, 1343 (10th Cir. 1984) (government "staged phony accidents, prepared false accident reports and traffic tickets, and entered pleas of guilty to the falsified charges" to convince defendant to falsify medical reports).

Examining "the connection between the crime prosecuted and the defendant[s'] prior conduct," *Mosley*, 965 F.2d at 913, only underscores the problem the defendants face. The crimes the government promoted are but cousins to ones the defendants were already busy committing — making meth rather than selling pills and marijuana, counterfeiting currency rather than forging checks. No doubt the new crimes represented a notch up in seriousness but neither were they exactly bolts from the blue. Indeed, this court has already approved a sting operation in which the government encouraged the defendant, very much as here, to extend his drug trafficking operations from one drug

14

(marijuana) to another more severely regulated one (cocaine). *Pedraza*, 27 F.3d at 1522.[1]

Looking to the defendants' actions and predisposition with respect to the new crimes only makes an already bad situation worse still. The district court found that Mr. Steele devised the counterfeiting scheme and hatched the idea to make methamphetamine.[2] Mr. Dyke said he had been "dreaming about" making the drug for years. The pair offered an undercover agent forged checks and identification documents so the agent could buy counterfeiting equipment. They sought to buy ingredients for producing methamphetamine and traded a firearm for needed equipment. They volunteered the use of a property Mr. Steele owned to house the planned new criminal operations. Now, to be sure, the defendants argue that they were not the most sophisticated of criminals, but even accepting that much the actions and words they freely

---

[1] Mr. Dyke seeks to distinguish *Pedraza* on the basis that a co-defendant in that case did have prior experience distributing cocaine, the drug the government urged the defendants in that case to distribute, while he and Mr. Steele had no prior experience distributing methamphetamine. *See* Appellant Dyke Reply Br. at 10-11. The difficulty with Mr. Dyke's argument is that none of the three defendants in *Pedraza* who alleged outrageous governmental conduct was mentioned to have any prior background with cocaine.

[2] Mr. Steele disputes these factual findings. But to overturn the district court's findings, Mr. Steele must show them to be clearly erroneous — that is, "more than possibly or even probably wrong but pellucidly so." *United States v. Ludwig*, 641 F.3d 1243, 1247 (10th Cir. 2011). And this he fails to do. Take by way of example the methamphetamine question. On undercover audio recordings, a government agent said in Mr. Steele's presence that Mr. Steele came up with the idea. The district court found it significant that Mr. Steele did not attempt to refute the assertion. Before us, Mr. Steele argues that he didn't say anything because he wasn't paying attention at the time. We don't doubt this bare assertion might be credited by a fact-finder. But neither do we doubt that a fact-finder could reasonably discredit the claim, as the district court did.

chose do little to help and much to hurt their cause. Indeed, we have found similar facts about a defendant's conduct and predisposition distinctly unhelpful to claims of outrageous governmental conduct. *See Pedraza*, 27 F.3d at 1522-23 (refusing to find outrageous governmental conduct where, among other things, the defendant was eager to participate in the government's proposed expansion of his drug trafficking operation); *Mosley*, 965 F.2d at 913 (same); *Diaz*, 189 F.3d at 1246 (same).

To all this, the defendants respond by pointing us to a few cases from other circuits that, they say, help their cause. But we've examined those cases and find them unpersuasive on their own terms. By way of example, the defendants cite *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). That case, however, has been criticized in its own circuit. *See United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983); *United States v. Jannotti*, 673 F.2d 578, 610 n.17 (3d Cir. 1982) (en banc). Even more to the point, it involved a very different set of circumstances from our own. The idea for the new illegal activity there came from the government while here, the district court found, it came from the defendants. The government's confidential informant there controlled the operation with minor assistance from the defendants, while here the defendants were well and eagerly engaged. Prior to the government's involvement, the defendants there had no history with illegal drugs, while the same cannot be said of the defendants here. Indeed, the Third Circuit itself has recently explained that *Twigg* "distinguished its facts from the situation where an undercover agent becomes involved in the operation after the criminal scheme has been created" and found that, for that reason it was "of little help" to

16

defendants (like those before us) who already had a criminal scheme up and running. *Nolan-Cooper*, 155 F.3d at 230. We freely acknowledge that the various circuits have proposed many and various tests for the outrageous governmental conduct defense. One (otherwise generally sympathetic) commentator has gone so far as to call the situation "mayhem." *See* Buretta, *supra*, at 1967. But Mr. Dyke and Mr. Steele not only fail under the test this court has suggested, they have also failed to persuade us that they might prevail under any other test any other court has suggested.

Without help from their outrageous governmental conduct defense, Mr. Dyke and Mr. Steele suggest we direct our attention to a few other questions.

Mr. Steele argues he was entrapped. As we've alluded to already, a successful entrapment defense exists when the government (1) induces the defendant to commit an offense that (2) the defendant was not predisposed to commit. *United States v. Ford*, 550 F.3d 975, 982 (10th Cir. 2008). Because the jury rejected any entrapment defense at trial, we may overturn its decision "only if no reasonable jury could have disallowed the defense," a daunting standard indeed. *United States v. Mendoza-Salgado*, 964 F.2d 993, 1002 (10th Cir. 1992).

Neither can we say so much here. A reasonable jury could well have found Mr. Steele predisposed to manufacture methamphetamine and counterfeit currency. In asking whether a defendant was "predisposed" to a certain crime, we ask about his "inclination to engage in the illegal activity . . . [his] read[iness] and willing[ness] to commit the crime." *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992). The necessary

17

inclination, this court has said, may be suggested by evidence of the "defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *United States v. Fadel*, 844 F.2d 1425, 1433 (10th Cir. 1988).

All of this, as we have seen, was present here. Mr. Steele raised the idea of using counterfeit currency in a large marijuana deal. He was eager to make methamphetamine and all too aware of the risk and reward calculus, wryly observing that it was either his path to riches and retirement or a cot and three squares. And he readily agreed to trade a firearm for ingredients to make the drug. Admittedly, as Mr. Steele emphasizes, he never personally possessed counterfeiting equipment and he wasn't personally involved in the manufacturing or trafficking of methamphetamine. But a reasonable jury could well have found from the facts presented at trial that he delegated responsibility for day-to-day operations to Mr. Dyke on these matters, as he did on many others, and thus that he was not exactly the "'unwary innocent'" he claimed to be. *United States v. Ortiz*, 804 F.2d 1161, 1166 (10th Cir. 1986).

Mr. Steele also says the district court erred at sentencing. In 21 U.S.C. § 841(b)(1)(A), Congress has directed that anyone who engages in a second controlled substance offense "after a prior conviction for a felony drug offense" is subject to a mandatory minimum term of 20 years in prison. The district court found this mandatory minimum triggered because of Mr. Steele's 1995 conviction in Kansas state court for

18

conspiring to sell yet another controlled substance, this time cocaine. Mr. Steele says the court's use of the 1995 Kansas conviction to enhance his sentence in this case amounted to legal error because that state court conviction was long ago expunged from his criminal record as a matter of state law.

Once again, we cannot agree. It is surely true that Mr. Steele's earlier conviction was expunged as a matter of state law, just as he says. But as a matter of plain statutory meaning there's also no question Mr. Steele has now engaged in a second drug offense "*after a conviction*" for a first one. "[E]xpunction under state law," after all, "does not alter the historical fact of the conviction." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 115 (1983), *superseded by statute*, Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449, *as recognized in Logan v. United States*, 552 U.S. 23, 27 (2007). Neither, of course, does state law normally dictate the meaning of a federal statute, at least absent some evidence Congress sought to defer to and incorporate state law, and here there is no such evidence before us. *Id.* at 112; *cf. State v. Edmondson*, 818 P.2d 855, 859-60 (N.M. Ct. App. 1991) (state refusing to defer to another state's expunction when interpreting its own law). Were the rule otherwise, the variance among state laws would risk disrupting the uniformity of the federal sentencing structure. *Dickerson*, 460 U.S. at 121-22; *see also United States v. Norbury*, 492 F.3d 1012, 1015 (9th Cir. 2007); *United States v. Mejias*, 47 F.3d 401, 404 (11th Cir. 1995). Congress clearly knows, too, how to ensure that expunged convictions are disregarded in later judicial proceedings: in other statutes it has done just that (*e.g.*, 18 U.S.C. § 921(a)(20)),

19

even as it made no similar effort here.

It is hardly insensible, moreover, to think Congress could have wished to account for expunged sentences in this particular statutory scheme. If expunging a conviction from a defendant's criminal record is designed to offer him the benefit of a fresh start and yet the defendant returns again into the same very sort of criminal activity, it's unclear why a statute aimed at punishing recidivism (as § 841(b)(1)(A) is) would afford the defendant the benefit of an offer he so manifestly rejected by his own conduct. Usually a defendant is said to "forfeit the benefits of the expungement for purposes of recidivist sentencing provisions, at least unless Congress provides otherwise." *United States v. Law*, 528 F.3d 888, 911 (D.C. Cir. 2008); *see also United States v. Campbell*, 980 F.2d 245, 251 (4th Cir. 1992). And (again) we see no evidence suggesting Congress provided otherwise here. To the contrary, as best we can tell every circuit to have addressed § 841(b)(1)(A)'s meaning agrees it did not. *See Law*, 528 F.3d at 911 (collecting cases from Second, Third, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits).

Mr. Steele rejoins that some of these cases from other circuits permit the consideration of deferred adjudications or convictions set aside or satisfied in some way, not ones *expunged* by state law. But, as it happens, other cases *do* address convictions expunged under state law and count them for purposes of § 841(b)(1)(A). *See, e.g.*, *United States v. Rivera-Rodriguez*, 617 F.3d 581, 609-10 (1st Cir. 2010). Besides, the distinction makes no difference. The question posed by § 841(b)(1)(A) is whether the defendant was previously convicted, not the particulars of how state law later might have,

20

as a matter of grace, permitted that conviction to be excused, satisfied, or otherwise set aside. To be certain, this isn't to suggest that the term "conviction" admits no subtleties of any kind. One might well ask, for example, whether as a matter of federal law itself a conviction vacated or reversed due the defendant's innocence or an error of law fairly qualifies as a "conviction" at all. *See, e.g.*, *Dickerson*, 460 U.S. at 115; *Norbury*, 492 F.3d at 1015. But nothing like that complication is present here. Even now, Mr. Steele does not challenge the lawfulness of his 1995 state conviction. For purposes of federal law, then, we can be sure that an expunged state conviction *is* a conviction.

Separately, Mr. Dyke says the court erred by failing to read to the jury a voluntary intoxication instruction he requested. Voluntary intoxication can be used, of course, as a *mens rea* defense to specific intent crimes, and Mr. Dyke was charged with several. *See United States v. Jackson*, 213 F.3d 1269, 1291 (10th Cir. 2000), *vacated on other grounds sub nom. Jackson v. United States*, 531 U.S. 1033 (2000). Of course, as well, a defendant is entitled to instructions on defenses supported by sufficient evidence for a jury to find in his favor. *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir. 1992).

The problem is that Mr. Dyke failed to present sufficient evidence to create a triable question of voluntary intoxication, just as the district court held. Mr. Dyke pointed only to the fact that undercover agents regularly brought beer to the farm and the atmosphere felt like a constant party to him. But be that as it may, Mr. Dyke's evidence is legally insufficient to warrant a voluntary intoxication instruction, and "insufficient not because it falls short of the quantum of evidence necessary, but because it is not evidence

21

of the right thing." *United States v. Boyles*, 57 F.3d 535, 542 (7th Cir. 1995). In order to merit an intoxication instruction, a defendant must point to evidence of mental impairment, impairment to the point that he could not form the *mens rea* necessary to commit the crime in question. *Id.*; *see also Jackson*, 213 F.3d at 1294; *United States v. Briseno-Mendez*, 153 F.3d 728, at *11 (10th Cir. July 17, 1998) (unpublished). Now, no one doubts that drinking beer in a convivial atmosphere (or any other) can lead to severe mental impairments. But it's equally true that drinking beer doesn't automatically and always render a person unable to form the *mens rea* necessary to commit a crime, rendering him immune to conviction. And problematically for him, Mr. Dyke presented no expert testimony or facts of any kind before the district court suggesting that his consumption of alcohol was so great that he could not have formed the *mens rea* required to commit the crimes in question. If anything, the evidence at trial ran in just the opposite direction: surveillance tapes failed to suggest any of the usual signs of impairment and audio recordings existed in which Mr. Dyke spoke all too coherently and clearly about his criminal plans. In these circumstances, we simply cannot fault the district court for holding that Mr. Dyke failed to present sufficient facts to warrant the instruction he sought.[3]

Affirmed.

---

[3] Mr. Dyke also brings a claim for ineffective assistance of counsel. Generally, however, claims of this sort should be brought on collateral review rather than direct appeal, *see United States v. Hahn*, 359 F.3d 1315, 1327 n.13 (10th Cir. 2004) (en banc), and we see no reason to think this case presents an exception.

22