**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 13, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JERRY DRAKE VARNELL,

    Defendant - Appellant.

No. 20-6040

(D.C. No. 5:17-CR-00239-D-1)

(W. D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

---

## I.  Introduction

In 2018, a federal grand jury returned a superceding indictment charging Defendant-Appellant, Jerry Drake Varnell, with maliciously attempting to destroy property used in and affecting interstate commerce, in violation of 18 U.S.C. § 844(i), and attempting to use a weapon of mass destruction against any person and property within the United States, in violation of 18 U.S.C. § 2332a.  Varnell moved to dismiss the charges on the grounds the government's conduct during the

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

investigation was so outrageous the government was constitutionally barred from prosecuting the offenses. The district court denied the motion to dismiss the charges. After Varnell was convicted, the court also denied his motion for judgment of acquittal. Varnell was sentenced to serve a 300-month term of imprisonment, a downward variance from the guidelines advisory range of life imprisonment. The district court arrived at this sentence by applying the twelve-level terrorism enhancement set out in § 3A1.4(a) of the United States Sentencing Guidelines, an enhancement to which Varnell objected.

In this appeal, Varnell argues the district court erred in concluding the government did not engage in outrageous conduct. He also challenges application of the terrorism enhancement. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we **affirm** the rulings of the district court.

## II. Background

In 2015, Varnell began an online friendship with an individual named Brent Elisens. The two initially shared a common interest in computers and computer programming. They later began using Facebook's group-messaging function to discuss political and social issues with other individuals.[1] At one point, the group made plans to obtain land and establish a small society free of capitalism. Elisens told Varnell he was not interested in the group's plans and intended to go "off

---

[1]After a group discussion about the possibility the government could monitor their online conversations, Varnell and Elisens began communicating through a mobile application called TextLock, which encrypted their messages.

-2-

grid" and leave all his possessions behind. Varnell agreed the group was naive and expressed his belief that the United States was headed for civil war. Varnell told Elisens he intended to form his own "team" and go after government officials when that happened. Varnell also told Elisens he knew enough about chemistry to make a bomb and stated: "It's time to bomb some fucking banks." Shortly before Elisens left Oklahoma, Varnell sent him an encrypted message stating: "I think I'm going to go with what the [Oklahoma City] bomber used, diesel and anhydrous ammonia. I might have to make a distillery to process some stuff, but that's a solid recipe."

When Elisens returned to Oklahoma a few months later, he was imprisoned in the county jail for violating the terms of his supervised release. While in jail, Elisens approached law enforcement about Varnell's plans to build and detonate a bomb. In January 2017, Elisens met with FBI agents and provided details about his online conversations with Varnell. He later provided the FBI with copies of text messages he had received from Varnell earlier in the year. Based on the messages shared by Elisens, the FBI opened an investigation and retained Elisens as a paid informant.

When Elisens was released from incarceration in March 2017, he reestablished contact with Varnell, this time in his capacity as an informant for the FBI. Elisens and Varnell continued their online discussions and the two met in person several times. Elisens recorded the in-person conversations. Among

-3-

other things, the two briefly discussed Varnell's past plan to put a "team" together. They also discussed the type of bomb Varnell was capable of building. Elisens offered to introduce Varnell to an individual with bomb-making knowledge whom he referred to as "the Professor." The Professor was actually an undercover FBI agent named Mark Williams. Varnell and Elisens met with Agent Williams in early June. Varnell and Williams discussed types of explosives, supplies, and potential targets. At two points in the conversation, Williams told Varnell that he could back out of the plans but Varnell did not express any hesitation in moving forward.

Varnell met with Williams again on June 26, 2017. The two discussed obtaining untraceable mobile phones, barrels into which they would put ammonium nitrate, and a vehicle into which they would load the barrels. They also discussed potential targets, with Varnell telling Williams he believed the best targets were located in Texas. Williams expressed logistical concerns about choosing a location too far away. After the meeting, Williams contacted Varnell and suggested they scout potential targets. When Williams picked up Varnell from his residence on July 13, 2017, Varnell stated he wanted to drive to Amarillo, Texas. At trial, Williams testified he was concerned by Varnell's request because the FBI surveillance plan did not include the possibility of a trip to Amarillo. Williams told Varnell he was under the impression the plan was to go to the BancFirst building in Oklahoma City. According to Williams, Varnell

-4-

agreed with that suggestion and expressed no surprise when he mentioned the BancFirst building. After they scouted the BancFirst building, Varnell described it as "a good spot" because there was an alleyway adjacent to the building where they could park the vehicle containing the bomb. At one point during the scouting trip, Williams again asked Varnell if he still wanted to go through with the plan. Varnell responded, "Fuck, yes."

As the date approached to construct the bomb, Varnell failed to complete several of the tasks assigned to him. Specifically, he was unable to secure a vehicle in which to deliver the bomb. Elisens stepped in and purchased a van, falsely telling Varnell he obtained the van from a person who owed him a favor. Varnell also failed to obtain gloves, tape, and barrels in which to put the ammonium nitrate. Accordingly, Williams drove Varnell to a store where Varnell purchased gloves and electrical tape with money Williams gave him. Williams and Varnell then drove to a storage locker where they used materials provided by the government to construct a bomb. Varnell was unaware the bomb was inert. Williams testified that Varnell was familiar with the process, participated in the construction, and was able to identify nearly all of the components of the bomb. After constructing the bomb, Varnell and Williams drove the van into the storage facility lot and placed the bomb inside the van.

On the morning of August 12, 2017, Varnell drove the van containing the inert bomb to Oklahoma City. Williams followed him in a separate vehicle.

When Varnell arrived at the BancFirst building he was unable to pull into the alleyway because it was blocked by a private security vehicle. Varnell circled the area until the vehicle left. He then pulled into the alley and parked the van. After arming the bomb, Varnell exited the van and got into Williams's truck. Williams drove to an area previously selected by the FBI and parked the truck. Varnell then attempted to detonate the bomb three times by using a mobile phone. After FBI bomb technicians confirmed that Varnell had correctly armed the bomb, agents approached Williams's truck and arrested Varnell.

Varnell was charged in a superceding indictment with maliciously attempting to destroy property used in and affecting interstate commerce, in violation of 18 U.S.C. § 844(i), and attempting to use a weapon of mass destruction against any person and property within the United States, in violation of 18 U.S.C. § 2332a. A week before trial, Varnell moved to dismiss the superseding indictment, alleging outrageous government conduct. *See United States v. Wagner*, 951 F.3d 1232, 1253 (10th Cir. 2020) ("When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct because [doing so] would offend the Due Process Clause of the Fifth Amendment." (quotation omitted)). The district court reserved ruling on Varnell's motion until the close of the government's case-in-chief. The court thereafter denied the motion from the bench. After the jury convicted Varnell of

both counts, the district court denied his motion for judgment of acquittal.

Varnell was sentenced to serve a total term of 300 months' imprisonment.  The

district court calculated this sentence by applying the twelve-level terrorism

enhancement set out in § 3A1.4(a) of the Sentencing Guidelines.  The court,

however, also varied downward from the advisory guidelines range of life

imprisonment.

In this appeal, Varnell challenges the district court's refusal to dismiss the

indictment based on outrageous government conduct.  He also asserts the district

court erred in applying the terrorism enhancement.

## III.  Discussion

### A.  Outrageous Government Conduct

This court "review[s] the denial of a motion to dismiss an indictment for

outrageous government conduct de novo."  *Wagner*, 951 F.3d at 1253.  "To prove

outrageous government conduct, the defendant must show 'either (1) excessive

government involvement in the creation of the crime, or (2) significant

governmental coercion to induce the crime.'"  *Id*. (quoting *United States v. Dyke*,

718 F.3d 1282, 1288 (10th Cir. 2013)).  In *United States v. Russell*, the Supreme

Court suggested that a defense based on outrageous government conduct may be

applicable when the "conduct of law enforcement agents is so outrageous that due

process principles would absolutely bar the government from invoking judicial

processes to obtain a conviction."  411 U.S. 423, 431-32 (1973).  To violate due

process principles, however, the government's conduct must "shock[] . . . the universal sense of justice." *Id*. at 432 (quotation omitted). In *United States v. Dyke*, this court described the defense as "something of a curiosity" and noted a plurality of the Supreme Court has backpedaled from the statements the Court made in *Russell*, suggesting the remedy for outrageous government conduct "lies 'not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.'" 718 F.3d at 1285 (quoting *Hampton v. United States*, 425 U.S. 484, 490 (1976)). In *Dyke*, we declined to decide whether the defense is still viable in this circuit, but noted it has never been applied by this court to strike down a conviction. *Id*. at 1287-88. As in *Dyke*, it is unnecessary to determine whether the defense of outrageous government conduct is available to defendants in this circuit because no such conduct occurred in this matter.

This court has summarized "guiding principles" applicable to the defense of outrageous government conduct as including (1) whether the government "engineers and directs the criminal enterprise from start to finish," and (2) "the past and current criminal activities of the defendant." *Id*. at 1288 (quotation and alterations omitted). The government argues Varnell failed to show it engineered the instant crimes from start to finish because Varnell had already formed a general plan to bomb a building before the FBI began its undercover operation. Varnell counters that he did not engage in any criminal activity until the FBI

became involved, and the government devised the crime and directed it from its inception. To the extent Varnell suggests that a lack of pre-investigation criminal activity on his part made the government's conduct per se outrageous, we reject that suggestion. First, Varnell cites no authority for this proposition and, second, we have previously discerned no due process concerns with permitting the government to conduct an undercover investigation even when "the government conceived and directed [the] crime in which defendant participated." *United States v. Gamble*, 737 F.2d 853, 858 (10th Cir. 1984) (holding the government's conduct was not outrageous even though it "used fictitious names to obtain driver's licenses, obtained insurance under those names for automobiles they did not own, orchestrated the production of false accident reports, appeared in court and pleaded guilty to traffic violations, and solicited defendant's aid in making false claims against insurance companies").

Although not dispositive, Varnell's conduct before the government began its investigation is relevant to the question of whether the government's conduct was outrageous under the totality of the circumstances. But, even accepting Varnell's assertion that his initial conduct was neither criminal nor an indication he had formed a concrete plan, the conduct was deeply disturbing. Varnell stated he was "out for blood" and wanted to "go[] after government officials when [he] had] a team"; he expressed an intent to form a team "to bomb some fucking banks"; and he told Elisens that "[t]he government is going to fucking burn with

-9-

those who stand with it." Varnell also touted his knowledge of bomb-making chemistry, and he specifically stated: "I finally have a chance to do something about how things are, I plan to do as much as I can. I've been reading about the best places to find stuff to make bombs." Varnell now asserts these statements are akin to puffery. But, in light of the frequency and specificity of Varnell's statements, the FBI would have been remiss in ignoring them.

Varnell's conduct after the FBI began its investigation likewise does not support his position that he is entitled to dismissal of the charges based on outrageous government conduct. *See Dyke*, 718 F.3d at 1288-89 (noting this court has applied the totality-of-the-circumstances analysis by looking at, inter alia, "how eagerly and actively the defendant himself participated in the *current* crime charged"). Admittedly, the government played a substantial role in the plan by providing all the materials necessary to complete the bomb and nearly all the expertise. But, in *Gamble*, we held the government's conduct was not outrageous even though evidence demonstrated the details of the plan originated with the government, not the defendant. 737 F.2d at 858. Further, Varnell's role in the crime was significant. He expressed no hesitation in meeting with Williams to discuss the logistics of the bombing, and thereafter actively participated in scouting targets and building the bomb. Crucially, Varnell drove the van containing the inert bomb to the BancFirst building, circled the building until a security vehicle left the alleyway, and then attempted to detonate the bomb three

-10-

times.  Although Williams provided Varnell with detailed instructions on how to arm the bomb, Varnell independently, and correctly, followed those instructions. These acts, which Varnell undertook entirely of his own volition, are alone sufficient to support the two charges of which Varnell was convicted.

Varnell also argues several underlying circumstances support his position that the government acted outrageously.  First, he asserts the government took advantage of his mental illness, and his appellate brief contains an extensive discussion of his mental health diagnosis and treatment.  At Varnell's trial, Dr. Shawn Roberson, a forensic psychologist, testified Varnell suffered from a mental health disorder that contributed to his "lack of insight and poor judgment" and caused him to be "passive and subordinate and deferential."  Varnell argues the government took advantage of his medical condition by "feeding his paranoia."

Varnell's mental health, while relevant, does not tip the scales in favor of concluding his due process rights were violated, particularly since he has not shown the government was fully aware of his condition or purposefully targeted him because of it.  *See United States v. Doe*, 698 F.3d 1284, 1293 (10th Cir. 2012) ("[T]he outrageous conduct defense focuses on the government's conduct.").  Varnell asserts his mental health records were readily available for the government to review but it failed to engage in any due diligence.  He cites no authority, however, for the proposition that the government acts in an outrageous manner by failing to fully investigate the mental health of an

-11-

individual targeted in an investigation. Further, although there was trial testimony that in March 2017 the government became aware of an allegation Varnell suffered from schizophrenia, one of the FBI agents involved in the investigation testified she was not aware of any evidence Varnell suffered from any "schizophrenic delusion or hallucinations during the course of [the] investigation or on the day of his arrest." Agent Williams, who interacted with Varnell more than any other FBI agent, testified he was not told Varnell was schizophrenic. And Dr. Roberson, Varnell's expert witness, testified that Varnell was "treated on an outpatient basis for schizophrenia between 2016-2017, and his symptoms were described as being stable with psychotropic medication." Dr. Roberson also testified that unless a person with paranoid schizophrenia is "exhibiting their paranoia towards you . . . or . . . talking about their delusions," "you might not ever know that they are mentally ill."

Having reviewed the entire record, we conclude the evidence does not show the government was aware Varnell was suffering from symptoms associated with his mental illness during the period of its investigation. Neither does it indicate agents knowingly took advantage of his mental illness to goad him into participating in the bombing plan. Accordingly, Varnell's mental health does not support the conclusion that the government's conduct was outrageous.

As part of our analysis of the overall circumstances, we also consider the undisputed evidence that Elisens provided Varnell with marijuana and the two

-12-

used it during their in-person meetings. Again, however, we must examine the government's conduct, not Elisens's conduct, *see id*., and there is no evidence supporting Varnell's assertion the government "tolerated" Elisens's conduct. According to Elisens, he told the FBI he would stop using marijuana when he became an informant. Further, Agent Eric Larsen testified the FBI admonished Elisens when it reviewed the surveillance tapes and "learned that he not only was smoking marijuana with Mr. Varnell but that he had actually taken marijuana to some of [the] meetings." The government's conduct as to Elisens's act of providing marijuana to Varnell falls far short of shocking "the universal sense of justice." *Russell*, 411 U.S. at 432 (quotation omitted).

There is no denying the FBI's investigation in this matter was aggressive and its participation in constructing the bomb and choosing a target was extensive. But this court has previously held that the outrageous government conduct doctrine does not necessarily apply even when the government "suggest[s] the illegal activity" and provides "supplies and expertise." *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994). Further, the statements Varnell made to Elisens before the investigation began were deeply troubling, and Varnell voluntarily engaged in serious criminal conduct during the course of the investigation. And Varnell has not shown that the FBI targeted him because of his mental illness or exploited his mental health. Having considered all the relevant circumstances, we conclude the government's conduct was not

"shocking, outrageous, and clearly intolerable." *Dyke*, 718 F.3d at 1289 (quotation omitted). Thus, Varnell's prosecution did not violate his right to due process.

### B. Terrorism Enhancement

Varnell also challenges his sentence, arguing the district court erred in applying the twelve-level terrorism enhancement to calculate his advisory guidelines range. *See* USSG § 3A1.4. According to Varnell, application of the enhancement increased his advisory guidelines range from 151–188 months to life imprisonment. He was sentenced to 300 months' imprisonment only because the district court varied downward.

"In determining whether the district court correctly calculated the recommended Guidelines range, we review *de novo* the district court's legal conclusions pertaining to the Guidelines and review its factual findings[] . . . for clear error." *United States v. Todd*, 515 F.3d 1128, 1135 (10th Cir. 2008). Pursuant to § 3A1.4 of the Sentencing Guidelines, a defendant whose crime of conviction was "a felony that involved, or was intended to promote, a federal crime of terrorism," receives a twelve-level enhancement to his base offense level and is assigned a criminal history category of VI. A "federal crime of terrorism" is defined as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and "(B) is a violation of . . . [18 U.S.C. §§] 844(i) . . . [or] 2332a." 18

-14-

U.S.C. § 2332b(g)(5); *see also* USSG § 3A1.4, cmt. n.1.  Varnell does not dispute

that the crime of conviction falls within the second part of this definition.

In the objection Varnell raised before the district court, he asserted

generally that the enhancement should not apply unless the government presented

"some evidence that the 'plot' that developed during the spring and summer of

2017 was [his] and that he intended to influence, affect or retaliate against

government conduct."  The United States Probation Office responded to this

objection in the Presentence Investigation Report ("PSR") as follows:

> [T]he probation officer believes that there is sufficient grounds,
> based on statements the defendant made to [Elisens] and [Williams]
> and in social media postings, that the purpose of this planned
> bombing was to either influence or affect the conduct of the
> government by intimidation or coercion, or to retaliate against
> government conduct. The defendant specifically discussed targeting
> federal facilities or data centers because of the impact that loss of
> such targets would have on commerce and the government, and his
> desire to cause harm to the government.

When the district court overruled the objection, it stated:

> With respect to this objection, . . . the Court agrees with and adopts
> the response of the report writer.  There was ample evidence
> introduced during trial that the defendant's actions were motivated
> by anger toward the government and a desire to incite a revolution.
> One need look no further than his so-called manifesto that he
> intended to disseminate via the Internet after the planned bombing.

The "manifesto" to which the district court referred was the following statement

Varnell drafted shortly before the planned detonation of the bomb:

> What happened in Oklahoma City was not an attack on America, it
> was retaliation.  Retaliation against the freedoms that have been

-15-

taken away from the American people. It was a wake-up call to both the government and the people, an act done to show the government what the people thinks [sic] of its actions. It is also a call to arms, to show people that there are still fighters among the American people. The time for revolution is now.

Elisens testified that Varnell sent him the statement and asked him to disseminate it online after the bombing.

On appeal, Varnell makes two narrow arguments. First, he asserts the manifesto is not dispositive of the question of whether the terrorism enhancement applies because it was written at the "insistence" of Elisens as part of "consistent and heavy-handed pressure" placed on him to participate in the bombing.[2] In the same vein, he further asserts the record evidence is insufficient to show he had the specific intent required by 18 U.S.C. § 2332b(g)(5) because the plan was concocted by the FBI and he was pressured into participating. Varnell's argument, however, is unresponsive to the relevant question of *why* he participated in the crimes of conviction. And, as to that question, Varnell has not

---

[2]Varnell also argues application of the enhancement was procedurally unreasonable because the district court failed to make necessary findings to support it. He asserts the court simply relied on the statement by the Probation Office in the PSR. This argument is unavailing for two reasons. First, Varnell failed to raise this issue before the district court. *See United States v. Steele*, 603 F.3d 803, 807 (10th Cir. 2010) ("If [defendant] had objections to the sentence imposed or, more particularly, to the decision-making process, he could and should have raised them at a time and in such a way as to afford the trial judge an opportunity to correct any error, clarify any ambiguity or elaborate as necessary."). Second, there was no procedural error. The district court clearly stated its decision was based on the language of the manifesto and other "evidence introduced during trial."

pointed to any evidence showing either the FBI or Elisens provided him with a motivation to participate in the bombing plan. For example, even if, as Varnell argues, Elisens influenced his decision to draft the manifesto containing his objectives for bombing the BancFirst building, he does not point to record evidence showing Elisens suggested any of the language or otherwise assisted him in composing it. There is likewise no evidence the FBI suggested to Varnell that he could, or should, incite a revolution by bombing buildings.

Varnell's second argument is raised for the first time in his reply brief. He asserts that the retaliation ground of 18 U.S.C. § 2332b(g)(5) cannot support application of the terrorism enhancement unless the government conduct against which he was allegedly retaliating was specifically identified. This argument is based on this court's recent ruling in *United States v. Ansberry*, 976 F.3d 1108, 1129 (10th Cir. 2020), where we held that "if a sentencing court applies a § 3A1.4 terrorism enhancement on the ground that the defendant's offense was calculated to retaliate against government conduct, the conduct that the defendant retaliates against must objectively be government conduct." Varnell's argument, however, like this court's holding in *Ansberry*, is limited to the so-called retaliation prong of § 2332(b)(g)(5). His reply brief specifically states: "[I]n light of the Court's ruling in *Ansberry*, to the extent the district court's decision is based on the 'retaliation' prong of § 2332b(g)(5), Appellant requests the district court be required to make specific findings as to: 1) what conduct

-17-

Appellant was retaliating against, and 2) whether that conduct is objectively governmental." Varnell makes no assertion the holding in *Ansberry* should be extended to the remaining provisions of § 2332b(g)(5) and has cited no precedent from this court or any other so extending *Ansberry*.

Even if we were to conclude that application of the terrorism enhancement on the grounds of retaliation could not be upheld under *Ansberry* because there was inadequate evidence or findings as to retaliation, the district court did not solely rely on the retaliation prong to apply this enhancement. The record contains ample evidence showing the bombing was "calculated to influence or affect the conduct of government by intimidation or coercion"—the provisions of § 2332b(g)(5) not addressed in *Ansberry*. For example, in September 2016, well before the FBI initiated its investigation, Varnell told Elisens: "If I could vote, I'd vote Trump. This country needs a revolution and the government needs to be weakened to give the people the courage to do it." Later in 2016, he told Elisens he was "out for blood" and was "going after government officials" once "militias start getting formed." On the same day, Varnell wrote to Elisens: "I finally have a chance to do something about how things are, I plan to do as much as I can. I've been reading about the best places to find stuff to make bombs." The next day, Varnell wrote: "When I'm able I'm going to do some Tyler Durden[3] shit.

---

[3]At trial, the government's witness testified that Tyler Durden is a fictional

(continued...)

The government is going to fucking burn with those who stand with it." On May 9, 2017, Varnell sent Elisens a message stating: "Hillary [Clinton] may not have won but big monopolies need to go down still. I don't have hope for trump but he's already fucking shit up bad" and another stating: "Fuck trump. Fuck monopolies. Shit needs to burn." When Varnell and Elisens were discussing possible targets Varnell stated: "Well we're doing this in the name of freedom. So whichever locations that would hurt the government the worst." On June 26, 2017, Varnell met with Williams and indicated it was important that the federal government be connected to the target location in some manner. He told Williams he wanted to do something that would "somehow cripple the government . . . and send[] a message that says, 'You are a target.'"

Considered as a whole, this evidence shows Varnell's intent was "to influence or affect the conduct of government by intimidation or coercion," 18 U.S.C. § 2332b(g)(5). Thus, there was no error in the application of the twelve-level terrorism enhancement.[4]

---

[3](...continued)
character from the movie, *Fight Club*. The character is involved in bombing buildings.

[4]Varnell raises several additional challenges to his sentence in his opening appellate brief. We consider them even though the government argues they are waived. First, he alleges procedural error in the district court's failure to consider his mental health as grounds for departure pursuant to USSG § 5H1.3 and in the court's failure to consider sentencing disparities. *See United States v. Lente*, 759 F.3d 1149, 1153 (10th Cir. 2014) (*Lente III*). As to Varnell's request for a

(continued...)

## IV. Conclusion

Varnell's convictions and sentence are **affirmed**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

---

[4](...continued)

departure, the district court, in fact, ruled on the request, concluding one was not warranted. This denial is not reviewable. *See United States v. Angel-Guzman*, 506 F.3d 1007, 1017-18 (10th Cir. 2007). As to the district court's consideration of sentencing disparities, this court has held that a sentencing court "must provide only a general statement of its reasons, and need not explicitly refer to either the § 3553(a) factors or respond to every argument for leniency that it rejects in arriving at a reasonable sentence" unless the sentence imposed is "above the applicable Guidelines range." *United States v. Lente*, 647 F.3d 1021, 1034-35 (10th Cir. 2011) (*Lente II*) (quotation omitted). Here, the district court varied downward when it imposed a 300-month sentence and Varnell has not identified any precedent requiring a district court to provide more than a general statement of reasons when it imposes a below-guidelines sentence.

Finally, Varnell argues his 300-month sentence is substantively unreasonable. There is, however, a "rebuttable presumption of reasonableness to a below-guideline sentence challenged by the defendant as unreasonably harsh." *United States v. Balbin-Mesa*, 643 F.3d 783, 788 (10th Cir. 2011). In light of the district court's detailed explanation of how it arrived at Varnell's below-guidelines sentence, the cursory argument in Varnell's appellate brief is insufficient to rebut the presumption of reasonableness applicable to his sentence.